AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

3/20/24

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>1473 Knight Road, Urbana, Ohio 43708,<br>and the surrounding curtilage and outbuildings. | )<br>)<br>) Case No.<br>)<br>) 3:24-mj-160<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2422(b) | Coercion and Enticement |
| 18 U.S.C. § 2423(b) | Travel with Intent to Engage in Criminal Sexual Activity |
| 18 U.S.C. § 2252A(a)(2) and (a)(5)(B) | Receipt and Possession of Child Pornography |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Scott Bauer, SA Homeland Security Investigations

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ Telephone _____ *(specify reliable electronic means)*.

Date: 3/20/24

City and state: Dayton, Ohio

Peter B. Silvain, Jr.
United States Magistrate Judge

## CONTINUATION OF APPLICATION FOR A SEARCH WARRANT

I, Scott Bauer, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## INTRODUCTION, AGENT BACKGROUND, AND PURPOSE OF THE WARRANT

1.     I make this continuation in support of an application for a search warrant to search **1473 Knight Road, Urbana, OH 43708 (SUBJECT PREMISES), which is further described in Attachment A.**

2.     The facts in this continuation come from my personal observations, my training and experience, and information obtained from other agents and witnesses.

Since this continuation is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause.

3.     I, Scott Bauer, am currently employed as a Special Agent with Homeland Security Investigations (HSI) and have been so employed since March of 2012. I am currently assigned to HSI Grand Rapids, MI. As an HSI Special Agent, I have investigated (among other crimes) criminal violations of U.S. Customs laws, and federal child sexual exploitation violations, to include those involving the use of the Internet and interstate communications. I have received training in the investigation of child sexual exploitation and I have conducted numerous investigations relating to sexual crimes against children through the use of the Internet. As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority

of the United States.

4.      Prior to employment with HSI, I was a Special Agent with the United States Department of the Interior (DOI) Office of the Inspector General (OIG) for approximately four years, focusing on the investigation of fraud, public corruption, and cyber-crimes, to include investigations relating to child sexual exploitation. Prior to employment with the DOI OIG, I was a Police Officer with the City of Casselberry, Florida for approximately two years and eight months.

5.      The purpose of this application is to seize evidence, more particularly described in Attachment B, of violations of (described more fully in Attachment A) for evidence, contraband, fruits, and instrumentalities of crime (described more fully in Attachment B) in violation of 18 U.S.C. § 2422(b) and 18 U.S.C. § 2423(b); and in violation of 18 U.S.C § 2252A(a)(2) and (a)(5)(B), which makes is a crime to knowingly receive and possess child pornography. 18 U.S.C. § 2422(b) makes it a crime to, using the mail or any facility or means of interstate or foreign commerce, knowingly persuade, induce, entice, or coerce any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so.  18 U.S.C. § 2423(b) makes it a crime to travel in interstate commerce for the purpose of engaging in illicit sexual conduct, or attempts to do so.

6.      It is a criminal sexual conduct in the first degree to engage in sexual penetration with another person who is under 13 years of age, in violation of Michigan Penal Code § 750.520b. "Sexual penetration" means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's

body or of any object into the genital or anal openings of another person's body, but emission of semen is not required. It is criminal sexual conduct in the second degree to engage in sexual contact with another person who is under 13 years of age, in violation of Michigan penal code § 750.520c. "Sexual contact" includes the intentional touching of the victim's or actor's intimate parts or the intentional touching of the clothing covering the immediate area of the victim's or actor's intimate parts, if that intentional touching can reasonably be construed as being for the purpose of sexual arousal or gratification, done for a sexual purpose.

7.     This crime was facilitated via the use of the Internet with communication beginning in January of 2024.

8.     All grammatical errors in the quoted communications between William G. MOON and SA Bauer detailed in this affidavit are from the original communications. The communications detailed below are not necessarily in chronological order.

## FACTUAL BACKGROUND OF INVESTIGATION

9.     On January 10, 2024, HSI Grand Rapids Special Agent (SA) Bauer, acting in an undercover (UC) capacity, entered a chatroom on Motherless.com (SA Bauer maintained an undercover account on Motherless.com that described SA Bauer as a single female, residing in the Midwest, and suggested the user had a child). SA Bauer received a private message from Motherless.com user **boredohioman** (subsequently identified as William G. MOON, as explained in more detail below) who initially asked about the weather and stated he was located near Dayton, OH. MOON asked if the UC was "hot" and asked, "and do you have a daughter?" MOON was told the UC had a 12-year-old daughter. The following exchange then occurred:

a.     boredohioman:  would you teach her to suck cock?

b.     UC: Id maybe let her be taught

c.     UC: do you have t o x?

d.     boreohionman: would you help?  grand rapids isnt that far

10.     At the suggestion of the UC, the conversation moved to Tox and the vast majority of subsequent communication then occurred via the Tox message platform. MOON's Tox username was "**boredohioman**." On January 10th, the following communication occurred via Tox:

a.     boredohioman: So you like that idea about your daughter?

b.     UC: Im open

    c.       boredohioman: When did you learn?

    d.       UC: 11

    e.       UC: Did I tell you my dau is 12? Sorry I get hit up by a lot of guys in ML

           lol

    f.       boredohioman: Yes. She's behind. Who taught you?

    g.       UC: Id rather not get into it

    h.       boredohioman: Ok. I understand. Would you help you daughter?

    i.       boredohioman: Your

    j.       UC: Id rather just watch

    k.       UC: Want her to have her own expereince

    11.     MOON later asked, "And she's she's ok with sucking and fucking older men."

MOON stated he wanted to "Chat here, see how it goes. Come visit, see how that goes.

Go from there." The following exchange later occurred:

    a.       boredohioman: What would happen if your daughter got pregnant?

    b.       UC: she hasnt had her period yet so Im not worried about that

    c.       UC: but once she gets it condoms are required

    d.       UC: I will not be a grandma!

    e.       boredohioman: 🤣😂😅

f.      UC: what did you mean when you said visit and see how that goes?

g.      boredohioman: Can we get her on the pill?

h.      boredohioman: And I meant see if everyone gets along

i.      UC: so nothing would happen?

j.      UC: Im not sure about the pill

k.      UC: are you clean?

l.      boredohioman: I guess it depends. Long way off. I haven't even seen either
        of you yet. And yes I'm clean

12.     MOON was told the 12-year-old girl's name was Stephanie but the UC
called her "Steph" and that daughter liked to draw.  MOON would later refer to the girl
as "the artist" and "Steph the Artist."

13.     Later in the conversation MOON wrote, "I just want to be sure you are real.
Just like you don't want to loser her, I don't want to go to jail."  MOON stated he was 59
years old and asked if the minor daughter would be ok with his age.  Later during the
same conversation MOON wrote, "I'm talking with a gorgeous lady who is talking about
letting me... For lack of a better word....Date her 12 year old daughter. Do you know how
impossible that is?"

14.     Throughout the communication MOON repeatedly expressed his fears that

3

the UC was in law enforcement and that this was a law enforcement operation and at one point stated he had "homework" for the UC and wrote, "It's find a way to prove... Prove... You aren't with any law enforcement agency."

15.　　The UC repeatedly told MOON he could change his mind at any time, which MOON said made him nervous as it was something a law enforcement official would say and that he continually deleted the pictures and communication. MOON also stated the UC and the daughter could also change their minds at any point. The UC also repeatedly told MOON that any sexual contact with the mother was not an option, which MOON acknowledged on several occasions.

16.　　On January 11th, 2024, the following exchange occurred:

a.　　boredohioman: And remember I'm coming there. You aren't coming here.

b.　　UC: ?

c.　　 boredohioman: That shows intent, the way the law sees it, the intent to commit a crime. And crossing state lines I believe makes it a federal charge.

17.　　Later during the same conversation, MOON wrote, "It's a shame we didn't start out as friends first. We would have gotten along great and then the rest would have been no problem. We did it backwards." When asked to clarify this, MOON wrote, "We

4

did the sex with the daughter talk first. Then became friends. If we had become friends, gotten to know each other first, then the sex with Steph wouldn't be any problem" and added, "She would either be ok or not and we'd still be friends".

18.     On January 17th, while discussing what MOON was interested in, MOONwrote (in part), "I'm seriously ok with anything. If we just talk, or if you or her change your mind or if it turns into some type of relationship, I'm cool." The following exchange then occurred:

a.      boredohioman: Ok. This will sound goofy. But I'd like it if the three of us had some type of 'family' relationship together. But you said that's not possible, so it's cool.

b.      boredohioman: And I make sense all the time.

c.      UC: whats a "family relationship" mean

d.      UC: I want everything to be about her

e.      UC: if thats not for you its totally fine

f.      boredohioman: Same here. If she is ok, with a one time thing, that's fine. If she wants more of a relationship, that is ok. But I don't know you and her expect

5

19. In a subsequent conversation on January 23rd, MOON wrote, "What I'd like is to eventually have sex with the both of you together but you said that won't happen. So I guess I'd just like to see her as long s she's happy".

20. The UC and MOON then discussed ways to decrease their fears of either being in law enforcement. The UC told MOON an STD test would be required with the results shown to the UC and the first meeting would have to occur in a public setting. MOON stated he didn't believe the UC would comply with his requests "because it would be stuff the police couldn't do" which he later clarified to be "bad pics" of the mom and daughter. This was further clarified to be nude pictures of both, which later turned into a request for a video of the UC and daughter. This is discussed in further detail in a subsequent section.

21. MOON suggested the UC and daughter drive to Ohio for the lunch meeting and offered to pay for the UC's gas for the trip. It would later be discussed that only the UC would travel, MOON agreed to pay for gas and lunch and settled on $75 to cover the expense.

22. The UC and MOON discussed meeting in Springfield, OH, but due to the distance the UC would be required to drive the two discussed meeting in Northwest Ohio. Due to the rural area, the UC stated a meeting in Toledo would be more

6

comfortable, to which MOON agreed. Eventually the pair agreed to meet in Wyoming, MI.

23.     The UC and MOON planned to meet each other at McAllister's Deli, located at 2380 Health Drive SW, Wyoming, MI 49519 on a date and time to be determined by MOON and shared with the UC only after MOON arrived. The UC and MOON agreed the purpose of this meeting would be only to confirm neither were in law enforcement and were in fact who each claimed to be with MOON providing the results of the STD test to the UC. No sexual contact would occur during this first meeting and the daughter would not be present. While discussing this meeting, MOON wrote, "But if you are a cop, I'm pretty sure this meeting shows premeditation to commit a crime." Upon confirmation the UC wasn't a law enforcement officer, MOON would wait one week and then travel back to West Michigan to engage in sexual intercourse with the daughter.

24.     On January 30, 2024, while discussing his fears of the UC being a law enforcement officer, MOON wrote, "Like if I was a cop, I'd keep offering you the chance to get out of it. That way if you do it, it's clear it was your decision." Later on January 30th, MOON wrote, "And I really want to fuck your daughter.. a lot. Is that ok?"

25.     MOON offered to buy the daughter gifts on numerous occasions to include a car if the relationship still existed when she turned 16. While discussing gifts, MOON

wrote, "Look. If I'm sleeping with her, I'm just gonna ask her. So you might as well get used to it. 😒". MOON would later purchase several gifts for the girl which will be detailed in a subsequent section.

26.     On February 5, 2024, while discussing the minor girl's concern about sex hurting, MOON wrote, "Yes. It has to be fun for her. If it hurts too much we can do other things", he would later clarify this to mean, "Sex isn't just putting your dick in and pumping. If you don't know, we need to get together first. Lol" and added, "Yes oral. I'm assuming she's curious about all of that." Later during the same conversation, MOON wrote, "It's her first time. I want it to be right, special for her."

27.     MOON stated, "I like tiny butts and tiny breasts" on February 6th and later asked the UC to tell the minor girl, "I know she is nervous but nothing she does will be wrong. I love tiny butts and breasts, so I think she's gorgeous. I think she looks stunning and that she's an amazing artist. And I'm excited get her tattoo." MOON would later write, "Can I see her butt?" "Lol. Send me pics....Lol".

a.     Agent's Note: MOON stated he wanted to get a tattoo designed by the daughter, this is detailed in a subsequent section.

28.     On February 6th after the UC told MOON he was restoring the UC's faith in men, MOON responded, "Well we are talking about me banging your young

8

daughter so let's not get carried away there."

29.     On February 23rd, MOON asked, "You think she will let me eat her butt?" MOON later wrote, "Ok. Let's talk about her butt some more. It's stuck in my brain. Is it tiny?"

30.     On February 26th, MOON wrote, "Does she want to give head and have her pussy eaten?" The UC told MOON the daughter wanted to try everything. Later on the same day, MOON wrote, "I think about eating her pussy all the time" and "I really want to eat her pussy. I love doing it and I think she will really like it".

31.     Later on February 26th, MOON believed he was communicating with the 12-year-old girl online, with the UC typing for the minor girl. The following exchange occurred:

    a.     boredohioman: So are you nervous?

    b.     UC: "yeah alot"

    c.     boredohioman: Guess what? I'm nervous too. I think that's normal. I'm also very excited

    d.     UC: "ok"

    e.     boredohioman: I know your mom is too. But it will be fun. We will only do

9

things you want to do. And if you change your mind, that's perfectly ok. I want you to have fun.

32.     MOON would later write, "You can tell her I really want to eat her pussy if you want".

33.     On February 27th, MOON stated:

a.      boredohioman: I like the idea of fucking her...a lot

b.      boredohioman: The idea of spending a long weekend fucking your 12 year daughter a lot makes my cock hard

c.      boredohioman: I think about fucking every single minute

d.      boredohioman: Fucking her

34.     MOON then added:

a.      boredohioman: I'm thinking about her sucking my cock and how good her pussy is going to taste

b.      boredohioman: I love the idea of seeing her a lot and being out it in public with her and then going back and making her feel good

c.      boredohioman: If I could, honestly, I would fuck her right now.

35.     Later on the same day, MOON wrote, "Tonight, ask your daughter how

10

bad she wants me to fuck her" and later added "I think about fucking her constantly." Also on February 27th, MOON wrote, "Can you imagine her when she learns to be on top and is riding my cock? You would not be a good mom if you didn't let that happen. 😈"

36.     On January 19th, when asked what MOON wanted, MOON stated, "I want to bang your daughter". Later during the same conversation, when asked why MOON didn't want to speak more about his plans with the minor girl, MOON wrote, "Talking about committing illegal acts."

37.     In March, while discussing a date to meet, MOON advised meeting at a predetermined time and location made him nervous about being arrested. MOON stated he preferred to travel to West Michigan without notifying the UC and once at a location, send a message to the UC stating where he was. The UC would then meet him at the location. The UC agreed to this scenario.

38.     On March 19, 2024, at approximately 11:06 a.m. MOON texted the UC and a picture of the front entrance of McAlister's Deli, located at 2380 Health Drive SW in Wyoming, MI. After the UC told MOON they were on their way, MOON stated, "I'll only paying for yours. Not your cop buddies." MOON's vehicle was observed backed into a parking spot in front of McAlister's Deli.

39.     At approximately 11:11 a.m., law enforcement officers executed the search

11

warrant on MOON's vehicle, a white Jeep Cherokee bearing Ohio license plate JJA 1809, and on his person. MOON was taken into custody and advised of his *Miranda* rights. He waived his rights and agreed to answer questions. MOON stated he left his residence at approximately 6:00 a.m. this morning and planned to meet with a woman named Stacy for lunch. MOON stated he only planned to have lunch with the woman and that he was excited to have lunch with the UC as he was a lonely man. MOON acknowledged using the boredinohio usernames in Motherless and Tox and stated he discussed having sex with the 12-year-old girl. MOON stated he has a sexual interest in children but was not sure if he would have an actual physical relationship with a minor. MOON stated it was possible he would have had sex with the 12-year-old girl if presented with the opportunity but stated he could not think that far in advance. MOON stated he brought an STD test with him and an STD test was located in the vehicle.

40.     MOON stated he has received child pornography from others on his phone via Tox, but stated he deleted it after receipt.

41.     Moon told investigators he had a laptop computer located in his residence that he may have used to access his Motherless.com account.

42.     Moon provided a home address of 1473 Knight Road in Urbana, OH (the SUBJECT PREMISES) and stated he lived alone.

12

## VIDEO REQUESTED BY MOON

43.     As previously stated, MOON was concerned about the UC being in law enforcement and expressed those concerns throughout the communication.  MOON stated the only way he could know for sure would be for the UC to create a video of the UC and the daughter, naked, and then transmit that video to MOON prior to any meeting.

44.     MOON wrote, "But you have to understand what you are offering is too good to be true." While discussing the risks involved, MOON wrote, "Ok. How about this? You make a video with you and daughter, naked. You say.. Please come fuck my daughter.. And then she says .. Yes please come fuck me. And bring me an art set. I would be assuaged."  The UC told MOON making and sending that video could result in her going to jail and MOON assured the UC he would delete the video.

45.     During conversations involving this video, MOON would state he no longer wanted the video, state the purpose of the video was only to confirm the UC was not in law enforcement and he did not wish to keep the video.   MOON also asked for a naked video of the UC alone "saying you want me to fuck your daughter".

46.     At one point the UC and subject were jokingly discussing making the video in Grand Rapids with MOON present.  MOON then wrote, "If I was in your house, and

13

you both were naked, and you said come fuck my daughter, and then she says, yes come fuck me... You would have to explain a dead man in your house!"

47.     On January 29th, the UC asked MOON to restate what MOON wanted the video to depict.  MOON wrote, "You both naked, you saying come fuck my daughter. And her then saying, yeah Will come fuck me."

48.     On January 30, 2024, while discussing the video, MOON wrote, "You know if you just sent me a video of you 2 naked, you wouldn't have to drive here. That's myp lame attempt to get you to do it tonight. Pretty lazy huh?"

    a.     Agent's Note:  At one point the UC and MOON planned for the UC to travel to Ohio to meet MOON.

49.     On February 1, 2024, MOON wrote, "The video isn't that big of a deal. I mean it's super hot. But I guess if we meet and you don't arrest me, I'll know you're real and serious. Video or not."

50.     MOON would later write, "I'd like proof of everything before I come there but I don't think that's going to happen. So I'm willing to not have it. Maybe if everything goes ok, you can make it in a year or so."  MOON would later add "If you want.  If you don't, it's ok.  By then, if everything is going well, it won't be a big deal".

14

51.     On February 5, 2024, after saying the video did not have to be produced, MOON wrote, "Who knows maybe she will want to make the video and she can talk you into sending it. 📷 Lol."

52.     On February 20th, while discussing easing MOON's concerns about the UC being in law enforcement, he wrote, "It's up to you. You could just send me one pic and be done with it all." Later, during the same conversation, following exchange occurred:

a.      boredohioman: If we meet, and you don't swarm me with cops, then I'll know you are real. The video doesn't really matter then. Other than that it would be really hot to see you both naked.

b.      UC: lol so you wanna see us naked but not to prove anything?

c.      boredohioman: If I see it after I meet you, it doesn't prove you are real. I already know you are when I meet you.

d.      boredohioman: Who would not want to see you both naked?

e.      UC: ok so no video

f.      boredohioman: Unless I can see it before we meet, it doesn't really serve a purpose. And you seem stressed about talking to her about it, and if she's gonna stress, it's not worth it

15

53. The UC and MOON discussed the UC bringing the video to their lunch meeting and showing MOON. MOON would later write, "Bringing things to lunch is too late. If I'm not arrested, I'll know you are real and serious." Later MOON wrote, "I just want to not be arrested".

54. On February 7th, MOON stated he drew the below picture in reference to the video:



## GIFTS FROM MOON

55.     MOON offered to purchase gifts for both the UC and the daughter.  He repeatedly said he would continue to purchase gifts for the girl regardless of them meeting or having sex and these gifts came with no strings attached.

56.     On January 22nd, the UC provided MOON with a link to an art set listed for sale on Amazon for approximately $40.   MOON stated, "You sure there's not a better one? I'm serious, money is not an object."

57.     Later on January 22nd, the UC provided MOON with a link to an art set listed for sale on Amazon for approximately $109.  MOON would later purchase and send that art set to the UC.  The final price for the item was $136.15 and the item was addressed to "Steph the Artist".   The item was gift wrapped with a message that said "Hope you enjoy your art set, Steph.  From A friend of a friend" The art set is pictured below:



58.     On January 31, 2024, while discussing additional gifts for the girl, MOON wrote "Buy thongs and those socks that are real long that go to her butt. You know the ones?" The UC and MOON would discuss the thongs and socks on numerous occasions with MOON adding that he liked "bright colors." MOON instructed the UC to find thongs and socks and tell him the cost so he could pay for them.

59.     On February 23rd, the UC sent MOON two Amazon links. One associated with thong underwear for kids and the other associated with thigh high socks. MOON then wrote, "I can't get the vision of her butt in those out of my head. Sorry." MOON later wrote, "Lol. I can't stop thinking about her butt in thongs."

60.     MOON stated he intended to create a separate Amazon account for the UC

18

and the daughter so he did not have to navigate the correct size and "Then all I have to do is REALLY hit buy".

61.     On February 27th MOON advised he purchased the thongs and socks and on February 29th they were delivered. SA Bauer retrieved the items on March 1st, they were addressed to "STEPH THE ARTIST" and they are pictured below:



## STD TEST

62.     During the communication MOON agreed to get an STD test. While

19

discussing showing the results to the UC, MOON wrote, in part, "If you are the cops, that's evidence." Eventually the UC and MOON agreed that MOON would bring the STD results to the lunch meeting with the UC.

63. While discussing this plan, MOON wrote, "I will get the test and the results. I will show them to you. It seems like you're trying to use this as proof that I'm trying to get with your daughter. Are you setting me up?" The UC assured MOON it wasn't a setup but rather the UC was expressing the concerns that MOON was not serious about his intentions and this would prove those intentions.

64. MOON advised he made an appointment and would be getting an STD test on February 2nd. On February 1st, MOON stated he lied to his insurance company so they would pay for the test as they required a justification for the test. MOON did not provide an honest answer for what he told his insurance company.

65. On February 5th, MOON stated he took an STD test. On February 19th MOON told the UC the results of this indicated he did not have any STDs. On February 22nd, MOON stated, "I did pick up my lab results today" and on February 28th MOON sent the below picture which detailed his HIV results were negative (MOON advised he was tested for other STDs as well).

20



## TATTOO

66.    The UC and MOON discussed MOON getting a tattoo during the second or other subsequent trips.   MOON requested the daughter design this tattoo.   MOON requested the tattoo be "something that reminds me of her."   MOON later wrote, in part, "I'm getting something she design's."  MOON also requested the minor girl's input on the tattoo location on his body.

21

67.   The UC sent the below image, drawn by SA Bauer, to MOON and stated the daughter had designed and drawn the image (the "STA" references "Steph The Artist" and the pencils depict ones that were part of the art set sent by MOON).



**IDENTIFICATION OF WILLIAM GEORGE MOON**

68.   During the communication with the UC, MOON stated he resided in Ohio, specifically that he was close to Dayton and Columbus. MOON also stated his name was Will, he was 59 years old, and sent images of himself to the UC.

69.     On March 19, 2024, the individual that was located in the parking lot was consistent in appearance with the images sent by MOON referenced above and confirmed by MOON's Ohio Driver's license.

## SUMMONS TO MOTHERLESS.COM

70.     On January 10, 2024, SA Bauer served a DHS summons to Motherless.com requesting subscriber information related to user **boredinohio**. On January 11, 2024, Motherless.com responded and provided the following information:

a.     Date Joined Jan 5th 2024 10:32:48 EST

b.     Date Last Login Jan 10th 2024 10:15:56 EST

c.     IP Joined 75.185.87.241

d.     IP Last Login 75.185.87.241

e.     Email Address williamgmoon1@gmail.com

f.     A log of user logins detailing dates/times and IPs.

71.     Via publicly available internet research, the IP address **75.185.87.241** was determined to be associated with Charter Communications (Spectrum).

72.     Based on the user's email (provided by Motherless.com), SA Bauer located a William G. MOON via Accurint. MOON was 59 years and listed an address of 1473 Knight Road in Urbana, Ohio (the SUBJECT PREMISES).   Urbana is just north of, and in

between, Dayton and Columbus.

73.     Based on the DOB listed in Accurint, SA Bauer was able to obtain Ohio driver's license information for MOON.   MOON's driver's license photo matched the images sent by MOON.   The address listed on the driver's license was the SUBJECT PREMISES.

### SUMMONS TO CHARTER COMMUNICATIONS (SPECTRUM)

74.     On January 11, 2024, SA Bauer served a DHS summons to Charter Communications (Spectrum) requesting subscriber information related to **75.185.87.241**. On January 17, 2024, Spectrum provided the following information:

a.     Subscriber: William MOON

b.     Service Address: 1473 KNIGHT RD, URBANA, OH 430788234 (the SUBJECT PREMISES)

c.     Phone Number: 937-508-9899

75.     During communication with the UC, MOON stated he drove a White Jeep Grand Cherokee.   A check of vehicles registered to MOON revealed a 2015 White Jeep Grand Cherokee bearing Ohio license plate JJA1809 and registered to MOON at the SUBJECT PREMISES.

76.     MOON also had a 2009 Black Honda Pilot bearing Ohio license plate

FDB3726 and also registered to MOON at the SUBJECT PREMISES.

77.     On March 19, 2024, MOON was taken into custody while parked and sitting in the 2015 White Jeep Grand Cherokee referenced above.

78.     MOON was advised of his *Miranda* rights.  He waived his rights and agreed to answer questions.  MOON stated he left his residence at approximately 6:00 a.m. the morning of March 19, 2024, and planned to meet with a woman named "Stacy," the name used for my undercover identity, for lunch.  MOON stated he only planned to have lunch with the woman and that he was excited to have lunch with the UC as he was a lonely man.  MOON acknowledged using the boredinohio usernames in Motherless and Tox and stated he discussed having sex with the 12-year-old girl.  MOON stated he has a sexual interest in children but was not sure if he would have an actual physical relationship with a minor.   MOON stated it was possible he would have had sex with the 12-year-old girl if presented with the opportunity but stated he could not think that far in advance.  MOON stated he brought an STD test with him and an STD test was located in the vehicle.

79.     MOON stated he has received child pornography from others on his phone, but stated he deleted it after receipt.

### PREVIOUS ARREST OF MOON

80.     On January 22, 2024, HSI Columbus, OH Special Agent (SA) Kenneth Teich obtained Westerville Polie Department (WPD) Report 2005-00002965 from WPD and provided it to SA Bauer. The report is summarized below.

81.     In April of 2005, a WPD officer posing as a 14-year-old received a message from an individual that was ultimately identified as MOON. MOON asked the UC "several sexual questions" and stated he also utilized an account called, "BORED_IN_OHIO_M" before the conversation ended.

82.     In August of 2005, the two made plans to meet with the purpose of MOON paying the girl for sexual intercourse. The two specifically discussed anal sex. MOON arrived to the predetermined location and requested the girl walk outside so he could observe her.

83.     MOON was then taken into custody and charged with and convicted of Importuning (felony), which is essentially the solicitation of sexual conduct with a minor.

84.     MOON pleaded guilty in July of 2006 and was sentenced 3 years of probation, credited with two days of incarceration, and classified as a sexually oriented offender.

85.     On March 4, 2024, I queried the state of Ohio sex offender registry and found that MOON is not registered as a sex offender.

26

## BACKGROUND ON MOTHERLESS.COM

86. Motherless.com is free website that allows users to create profiles and post pornographic videos and pictures based a variety of sexual interests. Motherless.com members may also conduct a search for videos and pictures posted on the website using a keyword search. The main page of Motherless.com reads, "Motherless is a moral free file host where anything legal is hosted forever! All content posted to this site is 100% user contributed. All illegal uploads will be reported. If you want to blame someone for the content on this site, blame the freaks of the world — not us. Feel free to join the community and upload your goodies." Motherless.com members may also create and join a variety of groups on the website based on their sexual interests, including over 100 groups. Motherless.com members may post advertisements in the website's "classified" section seeking to meet other members with the same sexual interests such as incest and rape. In addition, Motherless.com members may use the website's chat room service and instantly communicate with other members.

87. In my knowledge and experience and in the knowledge and experience of other law enforcement investigators, Motherless.com is regularly used by individuals who have a sexual interest in children as a means to communicate with other like-minded individuals and as a forum to meet others for the purpose of having sex with minors and

to share child pornography.

## BACKGROUND ON TOX

88.     Tox is a messaging platform that is free to download by any user  Once the program is downloaded and installed, it allows users to communicate directly with each other in a one-on-one session.  Files, such as pictures and gifs for example, are able to be shared between users.

89.     According to the Tox website, Tox is, "A new kind of instant messaging. Whether it's corporations or governments, digital surveillance today is widespread.  Tox is easy-to-use software that connects you with friends and family without anyone else listening in.  While other big-name services require you to pay for features, Tox is completely free and comes without advertising – forever."

90.     "Tox is made by the people who use it – people fed up with the existing options that spy on us, track us, censor us, and keep us from innovating.  There are no corporate interests, and no hidden agendas.  Just simple and secure messaging that is easy to use."

91.     In my knowledge and experience and in the knowledge and experience of other law enforcement investigators, Tox is commonly used by individuals to talk about their sexual interest in children.  Because Tox advertises itself as more secure, individuals who want to discuss illegal acts with children feel freer to openly discuss their interests.

28

## CHARACTERISTICS COMMON TO INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

92.     Based upon my knowledge, experience, and training in child exploitation and child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals interested in a sexual relationship with children. There is probable cause to believe that MOON is interested in sexual relationships with children based on the communications captured through Tox and Motherless. Characteristics common to people interested in having a sexual relationship with children include that they:

a.    Generally have a sexual interest in children and receive sexual gratification from viewing children engaged in sexual activity or in sexually suggestive poses, or from literature describing such activity.

b.    May collect sexually explicit or suggestive materials in a variety of media, including in hard copy and/or digital formats. People with a sexual interest in children oftentimes use these materials for their own sexual arousal and gratification. They may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse or groom a child to

29

participate in sex, or to demonstrate the desired sexual acts. They may also use toys, games, costumes, sexual clothing, sexual paraphernalia, and children's clothing to lure or entice children. They may keep "trophies" or mementos of sexual encounters with children, or items that they use to gratify a sexual interest in children, such as by collecting children's underwear or other items belonging to a child.

c.   May take photographs that either constitute child pornography or indicate a sexual interest in children by using cameras, video cameras, web cameras, and cellular telephones. Such images and video may be taken with or without the child's knowledge. This type of material may be used by the person to gratify a sexual interest in children.

d.   Generally maintain their communication indicating a sexual interest in children and child pornography in a safe, secure, and private environment, most often where they live and/or on their person. These images and videos can be downloaded onto desktop or laptop computers, computer disks, disk drives, data disks, system disk operating systems, magnetic media floppy disks, Internet-capable devices, cellular telephones, tablets, digital music players, and a variety of electronic data storage devices (hardware, software, diskettes, tapes, CDs, DVDs, SD cards, memory cards,

30

USB/jump/flash memory devices, external hard drives, and other digital storage media). The images can be stored in both digital and hard copy format and are usually hidden so that they are not found by other members of the individual's family.

e.  May correspond with and/or meet others to share information and materials; rarely destroy correspondence from others with a sexual interest in children; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, screen names, and telephone numbers of individuals with whom they have been in contact and who share the same sexual interest in children. Such correspondence may take place, for example, through online bulletin boards and forums, Internet-based chat messaging, email, text message, video streaming, letters, telephone, and in person.

93.  There is probable cause to believe that MOON has a sexual interest in children and has used Tox and Motherless to communicate regarding that interest.

94.  In addition, there is probable cause to believe that MOOM received and possesses child pornography. MOON admitted that he received and possessed child pornography on his cell phone. In my knowledge and experience, individuals who view child pornography will not limit their viewing to just one digital device. As described below, even if MOON had deleted the child pornography as he claimed, there are forensic

31

tools that can recover those images.

## SPECIFICS OF SEIZING AND SEARCHING COMPUTER SYSTEMS

95.     Computers and Internet-capable devices such as tablets and cellular telephones facilitate communication regarding a sexual interest in children.

96.     Storage capacity of computers and portable storage media, such as cellular telephones and USB or thumb drives, has grown tremendously in recent years. These devices can store thousands of images at very high resolution, are easily transportable, and are relatively inexpensive. Advances in technology have significantly reduced the size of digital storage devices such that now large numbers of digital files can be stored on media that will fit in a person's pocket, on a keychain, or in any number of easily transportable and concealable places. An individual can now easily carry on his or her person storage media that contains thousands of files, including images, video files, and full-length movie files.

97.     As with most digital technology, communications made from a computer device are often saved or stored on that device. Storing this information can be intentional, for example, by saving an email as a file on the computer or saving the location as a "favorite" website in a "bookmarked" file. Digital information can also be retained unintentionally. Traces of the path of an electronic communication may be stored automatically in many places, such as temporary files or Internet Service Provider (ISP) client software, among

others. In addition to electronic communications, a computer or cellular phone user's Internet activities generally leave traces in the device's web cache and Internet history files.

98.     A forensic examiner often can recover evidence that shows whether a computer device or cellular telephone contains peer-to-peer software, when the device was sharing files, and some of the files that were uploaded or downloaded. Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on a computer, the data contained in the file often does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.

99.     Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only

overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and device habits.

100.    Searches and seizures of evidence from computers, computer devices, and cellular phones commonly require agents to download or copy information from the devices and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following two reasons:

a.    Electronic devices can store the equivalent of millions of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data that is available in order to determine whether it is included in the warrant that authorizes the search. This sorting process can take days or weeks, depending on the volume of data stored, and is generally difficult to accomplish on-site.

b.    Searching electronic devices for criminal evidence is a highly technical

process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure that is designed to protect the integrity of the evidence and recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

101.    In order to retrieve data fully from an electronic device, the analyst needs all storage devices as well as the central processing unit (CPU). In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software that may have been used to create the data (whether stored on hard drives or on external media).

102.    Forensic examiners can also find the presence or absence of certain software and programs to determine who controlled a computer or electronic device at a given

time. Such evidence includes: viruses, Trojan horses, spyware, malware, and other forms of malicious software; the presence or absence of security software designed to detect malicious software; the lack of malicious software; and the presence or absence of software designed to protect a device from infiltration, access, or control by another person or entity, which may include pop-up blockers, security software, password protection, and encryption. Forensic examiners can also find evidence of software or programs designed to hide or destroy evidence.

103. The time period required for a complete, safe, and secure forensic examination of the computer and electronic devices is uncertain. The Government will make available for pick-up within a reasonable time all items found not to contain any contraband or material to be seized pursuant to the warrant and all hardware and software no longer needed for examination purposes. In conducting the search, the forensic examiner and agents will examine files regardless of their name because such names and file extensions can be altered to conceal their actual content. Because of the volume of data to be searched and the need to complete the examination in a reasonable time, the forensic examiner will also use computer techniques such as keyword searches that may result in the display of irrelevant materials.

104. Because investigators do not know all of the devices MOON used to access

the Internet; create, save, access, or hide evidence of his communication; or communicate with others about his sexual interest in children, investigators may need to preview all devices in his possession to determine which devices might contain evidence listed in Attachment B.

105.    Items determined on-scene not to contain items listed in Attachment B will be left. The remaining items will be seized and searched for further review or forensic examination and will be returned as soon as reasonably possible if they are determined not to contain evidence listed in Attachment B.

106.    Retention of any devices would be warranted, if any evidence of communications indicating an intent to violate 18 U.S.C. § 2422(b) or 18 U.S.C. § 2423(b) or child pornography in violation of 18 U.S.C. § 2252A is found thereon, in order to permit forfeiture of those computers and related properties as instrumentalities of the crime, pursuant to 18 U.S.C. § 2428. In addition, the vehicle MOON's utilizes to travel to West Michigan may also be subject for forfeiture as an instrumentality.

### REQUEST FOR SEALING

107.    I respectfully request that the Court issue an order sealing, until further order of this Court, all papers submitted in support of this application, including the application, continuation, attachments, and search warrant, and the requisite inventory

notice. I believe sealing is necessary because premature disclosure of the contents of this continuation and related documents may jeopardize this continuing investigation by alerting the target and providing an opportunity to destroy evidence.

## CONCLUSION

108. Based on the foregoing, there will be probable cause to believe that a violations of 18 U.S.C. § 2422 and 18 U.S.C. § 2423, which makes it a crime to knowingly persuade, induce, entice, or coerce any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so; and makes it a crime to travel in interstate commerce to engage in sexual conduct with minor or attempts to do so, and violations of 18 U.S.C § 2252A(a)(2) and (a)(5)(B), which makes is a crime to knowingly receive and possess child pornography, and that evidence, fruits, and instrumentalities of these offenses (described more fully in Attachment B) will be found at **1473 Knight Road, Urbana, OH 43708, the SUBJECT PREMISES** (described more fully in Attachment A).

//

//

//

38

//

//

109. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

Respectfully submitted,

SCOTT BAUER
Special Agent
Homeland Security Investigations

Subscribed and sworn to telephonically
on March 20, 2024:

Peter B. Silvain, Jr.
United States Magistrate Judge

39

**ATTACHMENT A**
**DESCRIPTION OF THE PERSON, PROPERTY, AND ITEMS TO BE SEARCHED**

1. 1473 Knight Road, Urbana, OH 43708 (SUBJECT PREMISES), is shown in the picture below. Based on the below image from publicly available Google Street View (created in July of 2019), the SUBJECT PREMISES appears to be a single story residence with a brick exterior.   The front of the SUBJECT PREMISES faces north and "1473" was observed on the mailbox as well as a green sign placed attached to the post of the mailbox.

2. Any outbuildings/garages located at the property at the time of execution

3.  A 2009 Black Honda Pilot bearing Ohio license plate FDB3726 and also registered to MOON if located at the SUBJECT PREMISES, or;

4. Any other vehicles located at the SUBJECT PREMISES and that are registered to the SUBJECT PREMISES or are in control of a resident of the SUBJECT PREMISES.



**ATTACHMENT B**

**ITEMS TO BE SEIZED AND SEARCHED**

1.     Any documents detailing information related to medical tests or exams with a purpose of screening for sexually transmitted diseases;

2.     Any maps, directions, handwritten notes or other documents related to violations of 18 U.S.C. § 2423

3.     Any and all computers, cellular telephones, or electronic media that were or may have been used as a means to commit violations of Title 18 U.S.C. § 2422, § 2423, and § 2251A including, but not limited to the following:

   a.     Any computer, computer system  and related peripherals; cellular phones, personal digital assistants, tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, scanners, modems, tape drives, disk applications programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer-related operation equipment, firewalls, switches, hubs, wireless access points, gaming consoles, web cameras, uninterrupted power supplies, hardware device power supplies, tape backup drives, digital video recorders, undeveloped photographic film, slides, and other visual depictions of such Graphic Interchange formats (including JPG, GIF, TIP AVI, and MPEG), and any electronic data storage devices including, hardware, software, diskettes, backup tapes, CD-ROMS,

DVD, flash memory devices, and other storage mediums; any input/output peripheral devices, including computer passwords and data security devices an computer-related documentation, and any hardware/software manuals related to or used to: communicate or facilitate the means to engage in sexual conduct with a minor.

4. Information, correspondence, records, documents or other materials pertaining to traveling to engage in sexual conduct with a minor, that were transmitted or received using computer, some other facility or means of interstate or foreign commerce, common carrier, of the U.S. mail including:

a. Envelopes, letters and other correspondence including electronic mail, chat logs, and electronic messages, establishing possession, access to, or transmission through interstate or foreign commerce, including by U.S. mail or by computer, of traveling to engage in sexual conduct with a minor or sending illicit material to a minor;

b. Books, ledgers and records bearing on the productions, reproduction, receipt, shipment, orders, requests, trades, purchases or transactions of any kind involving the transmission through interstate or foreign commerce, including by U.S. mail or by computer of traveling to engage in sexual conduct with a minor or sending illicit material to a minor;

c. Records, documents, or materials, including address books, mailing lists, supplier lists, mailing address labels, and documents and records pertaining to the preparation, purchase and acquisition of names or lists of

names to be used in connections with the traveling to engage in sexual conduct with a minor or sending illicit material to a minor, through interstate commerce including by U.S. mail or by computer;

    d.    Records, documents or materials, including address books, names and lists of names and addresses of minors involved with traveling to engage in sexual conduct with a minor or sending illicit material to a minor; and

    e.    Records of Internet usage, including user names and e-mail addresses and identities assumed for the purposes of communication on the Internet to travel to engage in sexual conduct with a minor or sending illicit material to a minor. These records may include ISP records, i.e., billing and subscriber records, chat room logs, e-mail messages and include electronic files in a computer and on other data storage mediums, including CDs or DVDs.

5.    Information, correspondence, records, documents or other materials pertaining to travel domestically or to foreign countries to facilitate having sex with a child:

    a.    Envelopes, letters and other correspondence including electronic mail, chat logs, and electronic messages, establishing travel records to foreign countries or domestically within the United States;

    b.    Books, ledgers, records and passports pertaining to domestic/foreign travel; and

    c.    Records, documents, or materials, including address books, mailing lists, supplier lists, mailing address labels, and documents and records

pertaining to the purchase, sale, or trade of children, domestically or in foreign countries.

6.     Child pornography depictions, including images and videos in digital and hard copy format.

7.     Information, correspondence, records, documents or other materials pertaining to a sexual interest in children and child erotica.

8.     Credit card information which evidences ownership or use of the computer equipment found in the above residence, including payment for computers or electronic media or other storage devices, disks, CD-ROMS, or similar containers for electronic evidence.

9.     Records or other items which evidence ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access and handwritten notes.

10.    Any computer hard drive or other electronic media physically located at the location or virtually connected to any computer within the location, found to contain information otherwise called for by this warrant:

a.     Evidence of who used, owned, or controlled the electronic media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, saved usernames and passwords, documents, and browsing history;

b.      Evidence of software that would allow others to control the electronic media, such as viruses, Trojan horses, and other forms of malicious software;

c.      Evidence of the lack of such malicious software;

d.      Evidence of the attachment to the electronic media of other storage devices, disks, CD-ROMS, or similar containers for electronic evidence;

e.      Evidence of the times the electronic media was used; and

f.      Passwords, encryption keys, and other access devices that may be necessary to access the electronic media.

11.     In order to search for the items described above that may be maintained in electronic media, law enforcement personnel seek authorization to search, copy image and seize the following items for off-site review:

a.      Any computer equipment and storage device capable of being used to commit, further or store evidence of the offense listed above;

b.      Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

c.      Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD's, DVD's,  optical disks, printer or memory buffers, smart cards, PC cards, memory  calculators, electronic dialers, electronic notebooks, and personal digital assistants;

d.     Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

e.     Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

f.     Any physical keys, encryption devices, dongles, and similar physical items necessary to gain access to the computer equipment, storage devices or data;

g.     Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data;

h.     Files, records, programs, logs, electronic communications, scanning programs, financial records, hacking software, and router configuration software;